1   Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2   2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
3   Telephone: (310) 915-6628
Facsimile: (310) 915-9897
4   Email: RMoest@aol.com

5   *Counsel for Plaintiff*

6

7

8          **IN THE UNITED STATES DISTRICT COURT**
         **NORTHERN DISTRICT OF CALIFORNIA**

9

10 | HUGUES GERVAT, derivatively on behalf of VOLTA, INC.,

11 |      Plaintiff, | Case No.:

12 |      v.

13 | SCOTT MERCER, FRANCOIS P. | DEMAND FOR JURY TRIAL

14 | CHADWICK, CHRISTOPHER WENDEL, ELI AHETO, VINCENT T. CUBBAGE, MARTIN

15 | LAUBER, KATHERINE J. SAVITT, BONITA C. STEWART, and JOHN J. TOUGH

16

17 |      Defendants,

18 |      and

19 | VOLTA, INC.,

20 |      Nominal Defendant.

21

22         **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

23

24

25

26

27

28

**INTRODUCTION**

Plaintiff Hugues Gervat ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Volta, Inc. ("Volta" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Scott Mercer ("Mercer"), Francois P. Chadwick ("Chadwick"), Christopher Wendel ("Wendel"), Eli Aheto ("Aheto"), Vincent T. Cubbage ("Cubbage"), Martin Lauber ("Lauber"), Katherine J. Savitt ("Savitt"), Bonita C. Stewart ("Stewart"), and John J. Tough ("Tough") (collectively, the "Individual Defendants," and together with Volta, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Volta, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, against Defendants Mercer and Chadwick for contribution under Section 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Volta, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Volta's directors and officers from August 2, 2021 through March 28, 2022 (the "Relevant Period").

2.      Volta is a Delaware corporation based in California. The Company is an electric vehicle ("EV") infrastructure company focused on building a network of EV charging stations. Volta currently maintains one of the most utilized EV charging networks in the United States. Volta's business model revolves around several pillars of revenue falling into the categories of behavior and commerce, network development, charging network operations, and network intelligence.

1

Verified Shareholder Derivative Complaint

3.      Volta's predecessor company was founded in 2010, under the name Volta Industries, Inc. ("Legacy Volta"). Legacy Volta operated as a private entity and only became public after a business combination with Tortoise Acquisition Corp. II (the "Business Combination"). The Business Combination was announced February 8, 2021 along with the proposed terms of the merger ("Business Combination Agreement"). The Business Combination Agreement, *inter alia,* provided for the distribution of restricted stock units ("RSUs") to Defendants Mercer and Wendel (the "Founder Incentive Adjustment Plan"). Upon the completion of the Business Combination on August 26, 2021, the Company distributed RSUs in accordance with the Business Combination Agreement to Defendants Mercer and Wendel. Volta's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "VLTA."

4.      On November 10, 2021, Volta announced its financial results for the third fiscal quarter ended September 30, 2021 (the "3Q 2021"). Specifically, Volta announced that selling, general, and administrative expenses were $29 million, resulting from a one-time expense related to non-cash stock-based compensation of $4.2 million, totaling a $43.1 million net loss for the three-month period.

5.      The truth began to emerge on March 2, 2022, when Volta revealed that the financial results it had released for 3Q 2021 were incorrect and that the Company had improperly evaluated the grant date of certain RSUs. After properly accounting the RSUs for the period 3Q 2021, the one-time expense related to non-cash stock-based compensation, for 3Q 2021, was $26.7 million higher than previously reported, resulting in the net loss for 3Q 2021 to actually be $69.7 million.

6.      On this news, the Company's stock price fell $0.11 per share, or 2.6%, from trading at $4.12 per share at close on March 2, 2022 to close at $4.01 per share on March 3, 2022. The stock price fell another $0.23 per share, or 5.7% the following day, from $4.01 per share at close on March 3, 2022 to $3.78 per share at close on March 4, 2022.

7.      On March 21, 2022, Volta announced that it would be rescheduling its earnings release for the fourth quarter ending December 31, 2021 and year end for the 2021 fiscal year.

8.      On this news, the Company's stock price fell $0.38 per share, or 8.4%, from $4.50 per share at close on March 18, 2022 to $4.12 per share at close on March 21, 2022.

9. Still, the investing public remained in the dark about Legacy Volta's founders, Defendants Mercer and Wendel's, imminent resignations as a result of the damage caused by the Company restating its 3Q 2021 financial statement.

10. On March 28, 2022, the truth fully emerged. Legacy Volta's founders, Defendant Mercer and Defendant Wendel, announced their resignation from their positions as CEO and President, respectively, and from the Board of Directors. On this news, the Company's share price fell $0.76 per share, or 18%, from $4.13 per share at close on March 25, 2022 to $3.37 per share at close on March 28, 2022.

11. During the Relevant period, the Individual Defendants breached their fiduciary duties to the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Volta's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Volta failed to properly account for the grant date of RSUs issued in connection to the Business Combination; (2) due to the foregoing, Volta understated its net loss for 3Q 2021; (3) there were material weaknesses in Volta's internal control over financial reporting that caused material error; (4) due to the foregoing, Volta would restate its financial statements; (5) as a result, Legacy Volta's founders would resign from the Company; (6) due to the foregoing, Volta's financial results would be negatively impacted, and (7) the Company failed to maintain internal controls. As a result of the foregoing, Volta's public statements were materially false and misleading at all relevant times.

12. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

13. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14. In light of the Individual Defendant's misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and its Chief Financial Officer ("CFO") to being named as defendants

in two federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (collectively, the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendant Mercer and Defendant Chadwick's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Volta's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15. U.S.C. §§ 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

17.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District,

and Volta is headquartered in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of Volta common stock. Plaintiff has continuously held Volta common stock at all relevant times.

### Nominal Defendant Volta

22.     Volta is a Delaware corporation with its principal executive offices located at 155 De Haro Street, San Francisco, CA 94103. Volta's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "VLTA."

### Defendant Mercer

23.     Defendant Mercer is a co-founder of Legacy Volta and served as the Company's CEO during the Relevant Period. According to the Company's proxy statement filed on Schedule 14A with the SEC on June 13, 2022 (the "2022 Proxy Statement"), as of June 10, 2022, Defendant Mercer beneficially owned 15,563,284 shares of the Company's Class A common stock, representing 9.2% of the Company's total outstanding Class A common stock as of that date. Given that the price of the Company's Class A common stock at close of June 10, 2022 was $2.21 per share, Defendant Mercer beneficially owned approximately $34.3 million worth of Volta stock.

24.     For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Mercer received $179,423,048 in total compensation from the Company. This included $437,500 in salary, $500,000 in bonus, $178,402,500 in stock awards, and $83,048 in other compensation.

25.     The Company's annual report for the fiscal year ended December 31, 2021 filed on Form 10-K with the SEC on April 15, 2022 (the "2021 10-K") stated the following regarding Defendant Mercer:

**Scott Mercer.** Mr. Mercer founded Volta in 2010 and has served as Chief Executive Officer of Volta and member of the Board. Mr. Mercer served from Volta's founding until March 2022. Mr. Mercer holds a B.A. in business from California Polytechnic State University-San Luis Obispo. On March 28, 2022, the Company announced that the Company and Mr. Mercer entered into an agreement under which Mr. Mercer resigned as a director of the Company effective as of March 26, 2022. Mr. Mercer will continue as the Chief Executive Officer for a transition period ending on the earlier of (i) the date on which

the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 is filed with the Securities and Exchange Commission and (ii) April 29, 2022.

**Defendant Chadwick**

26.     Defendant Chadwick served as the Company's CFO during the relevant period. According to the 2022 Proxy Statement, as of June 10, 2022, Defendant Chadwick beneficially owned 189,613 shares of the Company's Class A common stock. Given that the price of the Company's Class A common stock at close of June 10, 2022 was $2.21 per share, Defendant Chadwick beneficially owned approximately $419 of Volta stock.

27.     For 2021 Fiscal Year, Defendant Chadwick received $9,671,612 in total compensation from the Company. This included $280,000 in salary, $400,000 in bonus, $6,464,697 in stock awards, $2,515,000 in option awards and $11,915 in other compensation.

28.     The 2021 10-K stated the following about Defendant Chadwick:

**Francois P. Chadwick.** Mr. Chadwick has served as Volta's Chief Financial Officer since April 2021. Prior to joining Volta, since May 2011, Mr. Chadwick served in various roles at Uber culminating in his role as Vice President, Finance Tax & Accounting. Prior to this, Mr. Chadwick served as a tax partner and national tax leader at KPMG US. Mr. Chadwick holds a Bachelor of Laws from Liverpool John Moores University in Liverpool, UK.

**Defendant Wendel**

29.     Defendant Wendel is a co-founder of Legacy Volta and served as the Company's President during the relevant period. According to the 2022 Proxy Statement, as of June 10, 2022, Defendant Wendel beneficially owned 11,002,636 shares of the Company's Class A common stock, representing 6.6% of the Company's total outstanding Class A common stock as of that date. Given that the price of the Company's Class A common stock at close of June 10, 2022 was $2.21 per share, Defendant Wendel beneficially owned approximately $24.3 million worth of Volta stock.

30.     For the 2021 Fiscal Year, Defendant Wendel received $151,965,715 in total compensation from the Company. This included $391,667 in salary, $450,000 in bonus, $151,041,000 in stock awards, and $83,048 in other compensation.

**Defendant Aheto**

31.     Defendant Aheto has served as a Company director since August 2021, after the Business Combination. Prior, he served as a director for Legacy Volta from October 2016 to August 2021. He is

also Chair of the Audit Committee. According to the 2022 Proxy Statement, as of June 10, 2022, Defendant Aheto beneficially owned 253,623 shares of the Company's Class A common stock. Given that the price of the Company's Class A common stock at close of June 10, 2022 was $2.21 per share, Defendant Aheto beneficially owned approximately $560.5 of Volta stock.

32.     For the 2021 Fiscal Year, Defendant Aheto received $27,826 in total compensation from the Company, which only consisted of cash compensation.

33.     The 2022 Proxy Statement stated the following about Defendant Aheto:

**Eli Aheto.** Mr. Aheto has served on the Volta board of directors since October 2016. Mr. Aheto has served as a Managing Director at General Atlantic since July 2021. He has served on the boards of directors of the following private companies: 80 Acres Urban Agriculture, Inc. d/b/a "80 Acres Farm," an indoor farming company from December 2018 to January 2021, 4AM Midstream, a midstream oil and gas gathering company, from July 2017 to June 2021 and Nautilus Solar Energy Inc., a community solar project developer from October 2015 to July 2019. Mr. Aheto was a Partner with Virgo Investment Group, a private investment firm, from 2015 to June 2021. Mr. Aheto holds an A.B. in economics from Harvard University and an M.B.A. from Harvard Business School.

### Defendant Cubbage

34.     Defendant Cubbage has served as Volta's Interim CEO since June 2022 and as a Company director since August 2021. He is the chair of the Nominating and Corporate Governance Committee and also a member of the Audit Committee. According to the 2022 Proxy Statement, as of June 10, 2022, Defendant Cubbage beneficially owned 1,497,884 shares of the Company's Class A common stock. Given that the price of the Company's Class A common stock at close of June 10, 2022 was $2.21 per share, Defendant Cubbage beneficially owned approximately $3.3 million worth of Volta stock.

35.     For the 2021 Fiscal Year, Defendant Cubbage received $27,826 in total compensation from the Company, which only consisted of cash compensation.

36.     The 2022 Proxy Statement stated the following about Defendant Cubbage:

**Vincent Cubbage.** Mr. Cubbage has served as Volta's Interim Chief Executive Officer since June 2022. Mr. Cubbage has served on the Volta board of directors since the closing (the "Closing") of the business combination in August 2021 (the "Business Combination") with our predecessor, Tortoise Acquisition Corp. II ("Tortoise Corp II"), and served as Chief Executive Officer and Chairman of Tortoise Corp II from July 2020 until the completion of the Business Combination. Mr. Cubbage has served as Chief Executive Officer and Chairman of the Board of Directors of TortoiseEcofin Acquisition Corp. III since February 2021. Mr. Cubbage served as Chief Executive Officer and Chairman of

Tortoise Acquisition Corp. from March 2019 to the completion of its initial business combination with Hyliion Inc. on October 1, 2020, and he continues to serve on the board of directors of Hyliion Holdings Corp. He has served as Managing Director — Private Energy of Tortoise Capital Advisors, L.L.C. since January 2019. Mr. Cubbage served as the Founder and Chief Executive Officer of Lightfoot Capital Partners from its formation in 2006 through its wind up in December 2019. He served as Chief Executive Officer and Chairman of the general partner of Arc Logistics Partners LP (NYSE: ARCX), from October 2013 to the date of its sale in December 2017. Prior to founding Lightfoot Capital, Mr. Cubbage was a Senior Managing Director in the Investment Banking Division of Banc of America Securities from 1998 to 2006; and prior to that was a Vice President at Salomon Smith Barney where he worked from 1994 to 1998. Mr. Cubbage received an M.B.A. from the American Graduate School of International Management and a B.A. from Eastern Washington University.

### Defendant Lauber

37.     Defendant Lauber has served as a Company director since August 2021, after the Business Combination. Prior, he served as a director for Legacy Volta from June 2020 to August 2021. He is also a member of both the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of June 10, 2022, Defendant Lauber beneficially owned 1,661,252 shares of the Company's Class A common stock. Given that the price of the Company's Class A common stock at close of June 10, 2022 was $2.21 per share, Defendant Lauber beneficially owned approximately $3.6 million worth of Volta stock.

38.     For the 2021 Fiscal Year, Defendant Lauber received $25,217 in total compensation from the Company, which only consisted of cash compensation.

39.     The 2022 Proxy Statement stated the following about Defendant Lauber:

**Martin Lauber.** Mr. Lauber has served on the Volta board of directors since June 2020. Since June 2013, Mr. Lauber has served as a Managing Partner at 19Y Ventures VI, LLC, a marketing communications investing and strategic advisory firm, which he also founded. Mr. Lauber is also the Managing Partner of 19Y Ventures VI, LLC and has been active in technology and mobility investing and advising for several years. Prior, Mr. Lauber was Founder and CEO of Swirl, a pioneering digital marketing agency from 1997 to 2017. Mr. Lauber holds a bachelor's degree in American Studies from the University of California, Los Angeles.

### Defendant Savitt

40.     Defendant Savitt has served as a Company director since August 2021, after the competition of the Business Combination. She is also a member of both the Compensation Committee and the Nominating and Corporate Governance Committee, and since her appointment on June 12, 2022,

the Chairperson of the Board. According to the 2022 Proxy Statement, as of June 10, 2022, Defendant Savitt beneficially owned 394,387 shares of the Company's Class A common stock. Given that the price of the Company's Class A common stock at close of June 10, 2022 was $2.21 per share, Defendant Savitt beneficially owned approximately $871.6 thousand worth of Volta stock.

41.     For the 2021 Fiscal Year, Defendant Savitt received $35,652 in total compensation from the Company, which only consisted of cash compensation.

42.     The 2022 Proxy Statement stated the following about Defendant Savitt:

**Katherine J. Savitt.** Ms. Savitt has served on the Volta board of directors since December 2018. Ms. Savitt has served as President and Chief Business Officer of Boom Supersonic, an aviation and aerospace company, since January 2021. From 2016, Ms. Savitt served as a founding General Partner of Perch Partners, LLC, a management consulting firm. Prior to that, Ms. Savitt served as Chief Marketing Officer and Head of Global Media at Yahoo Inc. From 2009 to 2012, Ms. Savitt served as CEO of Lockerz, Inc., a shoppable digital magazine company, which she co-founded. Prior to this, Ms. Savitt served as Executive Vice President and Chief Marketing Officer of American Eagle Outfitters Inc. Ms. Savitt holds an A.B. in history and government from Cornell University.

**Defendant Stewart**

43.     Defendant Stewart has served as a Company director since March 2021. She is also a member of both the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of June 10, 2022, Defendant Stewart beneficially owned 166,270 shares of the Company's Class A common stock. Given that the price of the Company's Class A common stock at close of June 10, 2022 was $2.21 per share, Defendant Stewart beneficially owned approximately $367.4 of Volta stock.

44.     For the 2021 Fiscal Year, Defendant Stewart received $25,217 in total compensation from the Company, which only consisted of cash compensation.

45.     The 2022 Proxy Statement stated the following about Defendant Stewart:

**Bonita C. Stewart.** Ms. Stewart has served on the Volta board of directors since March 2021. Since 2006, Ms. Stewart has served in various roles at Google, Inc., a wholly owned subsidiary of Alphabet Inc., a global technology company, including most recently as Board Partner at Gradient Ventures, Google's early stage venture arm focused on AI enabled companies, since June 2021. At Google, Ms. Stewart previously served as Vice President, Global Partnerships from July 2016 to June 2021; as Vice President, Americas, Partner Business Solutions from August 2012 to December 2015; as Vice President, U.S. Sales and Operations from 2011 to 2012; as Managing Director, U.S. Sales from 2009 to

2010; and as Industry Director, U.S. Automotive from 2006 to 2009. Prior to Google Ms. Stewart held management and brand executive roles at IBM and DaimlerChrysler. Ms. Stewart has served on the board of directors of Deckers Outdoor Corporation, a footwear design and distribution company, since September 2014 where she currently chairs the Corporate Governance committee and PagerDuty, a digital operations management company, since January 2021. Ms. Stewart holds a B.A. degree in Journalism from Howard University and an M.B.A. from Harvard Business School.

**Defendant Tough**

46.     Defendant Tough has served as a Company director since August 2021, after the Business Combination. Prior, he served as a director for Legacy Volta from May 2019 to August 2021. He is the chair of the Compensation Committee and is also a member of the Audit Committee. According to the 2022 Proxy Statement, as of June 10, 2022, Defendant Tough beneficially owned 12,813,274 shares of the Company's Class A common stock, representing 7.6% of the Company's total outstanding Class A common stock as of that date. Given that the price of the Company's Class A common stock at close of June 10, 2022 was $2.21 per share, Defendant Tough beneficially owned approximately $28.3 million worth of Volta stock.

47.     For the 2021 Fiscal Year, Defendant Tough received $29,565 in total compensation from the Company, which only consisted of cash compensation.

48.     The 2022 Proxy Statement said the following about Defendant Tough:

**John J. Tough.** Mr. Tough has served on the Volta board of directors since May 2019. Mr. Tough has worked at Energize Ventures as a Managing Partner since September 2019 and as a Partner from February 2017 to August 2019. Prior to this, Mr. Tough worked at Choose Energy, Inc., a consumer services technology company, as Chief Revenue Officer from 2016 to May 2017, Vice President of Business Development & Operations from January 2014 to 2016 and Director — Business Development from June 2012 to January 2014. He also currently serves as a member or observer on the boards of directors of the following private computer software companies: Matroid, Inc., Aurora Solar Inc., Sitetracker, Inc. and Smartcar, Inc. In addition, Mr. Tough also currently serves as a member or observer on the boards of directors of the following private companies: ZEDEDA Inc., an information technology and services company, DroneDeploy, Inc., an aerial analytics information technology company, and Nozomi Networks Inc., a computer and network security company. Mr. Tough holds a B.S. in biology, chemistry and markets and management from Duke University and an M.B.A. from The University of Chicago — Booth School of Business.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

49.     By reason of their positions as officers, directors, and/or fiduciaries of Volta and because of their ability to control the business and corporate affairs of Volta, the Individual Defendants owed Volta and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Volta in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Volta and its shareholders so as to benefit all shareholders equally.

50.     Each director and officer of the Company owes to Volta and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Volta, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

52.     To discharge their duties, the officers and directors of Volta were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

53.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Volta, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Volta's Board at all relevant times.

54.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

55.     To discharge their duties, the officers and directors of Volta were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Volta were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Volta's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Volta conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Volta and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Volta's operations would comply with all applicable laws

and Volta's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)   exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)   examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

56.   Each of the Individual Defendants further owed to Volta and the shareholders the duty of loyalty requiring that each favor Volta's interests and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

57.   At all times relevant hereto, the Individual Defendants were the agents of each other and of Volta and were at all times acting within the course and scope of such agency.

58.   Because of their advisory, executive, managerial, and directorial positions with Volta, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

59.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Volta.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who was a director of Volta was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Volta and was at all times acting within the course and scope of such agency.

## VOLTA'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### Code of Conduct

65.     The purpose to Volta's Code of Conduct reads, in relevant part, "Volta Inc. […] is committed to promoting high standards of honest and ethical business conduct and compliance with applicable laws, rules and regulations."

66.     The Code of Conduct's purpose continues by stating "[t]he Company has adopted this Code to set expectations and provide guidance applicable to all members [] of the Company's Board of Directors [] and officers, employees, independent contractors and consultants of the Company."

67.     The Code of Conduct further states:

The Company expects all of its directors, executive officers, managers and other supervisory personnel to act with honesty and integrity, use due care and diligence in performing responsibilities to the Company, help foster a sense of commitment to this Code among its employees and foster a culture of fairness, honesty and accountability within the Company. The Company also expects such personnel to ensure that the Company's agents and contractors conform to the standards of this Code when working on the Company's behalf.

68.     Under the title "Legal Compliance" the Code of Conduct reads, "[a]ll directors and employees are expected to comply with the law while performing their duties to the Company."

69.     The Code of Conduct section on "Conflicts of Interest" states:

In order to make good decisions for the Company, directors and employees need to be aware of their own biases and make sure they counter them. Employees are expected to avoid actual or apparent conflicts of interest between their personal and professional relationships. For directors, this may include recusal from discussions of the Board when their participation could be perceived as creating such a conflict.

A "conflict of interest" occurs when a personal interest interferes in any way (or even appears or could reasonably be expected to interfere) with the interests of the Company as a whole. Sometimes conflicts of interest arise when an employee takes some action or has some outside interest, duty, responsibility or obligation that conflicts with an interest of the Company or the employee's duty to the Company. A conflict of interest can arise when an employee takes actions or has interests that may make it difficult to perform the employee's duties objectively and effectively. Conflicts of interest can also arise when an employee or relative of an employee (including a family member of an employee) receives improper personal benefits as a result of the employee's position at the Company.

70.     Under the heading, "Financial Integrity; Public Reporting," the Code of Conduct states, in relevant part:

The Company strives to maintain integrity of the Company's records and public disclosures. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees and others with whom the Company does business. The Company depends on the books,

records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

To help ensure the integrity of the Company's records and public disclosures, the Company requires that:

- no entry be made in the Company's books and records that is intentionally false or misleading;

- the transactions must be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records;

- employees comply with the Company's system of internal controls and held accountable for their entries;

- any off-balance sheet arrangements for the Company are clearly and appropriately disclosed;

- employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents;
- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and

- records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

The Company's disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the [SEC] and other public disclosures are complete, fair, accurate, fairly present the Company's financial condition and results of operations and are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should be familiar with and adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all of the information about the Company that is required by law and would be important to enable investors to understand the Company's business and its attendant risks. These controls and procedures include, but are not limited to, the following:

- no employee may take or authorize any action that would cause the Company's financial records or financial disclosures to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with the Company's finance department, as well as the Company's independent auditors and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's book and records, as well as its reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

In connection with the preparation of the financial and other disclosures that the Company makes to the public, including by press release or filing a document with the SEC, directors must, in additional to complying with all applicable law, rules and regulations, follow these guidelines:

- act honestly, ethically, and with integrity;

- comply with this Code;

- endeavor to ensure complete, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC;

- raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;

- act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and

- comply with the Company's disclosures controls and procedures and internal controls over financial reporting.

If an employee becomes aware that the Company's public disclosures are not complete, fair and accurate, or if an employee becomes aware of a transaction or development that the employee believes may require disclosure, the employee should report the matter immediately.

71.     The Code of Conduct states the following regarding the conduct of senior financial employees:

The Company's Finance Department has a special responsibility to promote integrity throughout the organization, with responsibilities to stakeholders both inside and outside the Company. As such, the Board requires that the Chief Executive Officer and senior personnel in the Company's finance department adhere to the following ethical principles

and accept the obligation to foster a culture throughout the Company as a whole that ensures the accurate and timely reporting of the Company's financial results and condition.

Because of this special role, the Company requires that the Chief Executive Officer, Chief Financial Officer, Vice President of Finance, Controller and any other persons performing similar functions ("***Senior Financial Employees***"):

- Act with honestly and integrity and use due care and diligence in performing their responsibilities to the Company.

*          *          *

- Provide Constituents with information that is accurate, complete, objective, relevant, timely and understandable, including information for inclusion in the Company's submissions to governmental agencies or in public statements.

- Comply with applicable laws, rules, and regulations of federal, state and local governments and of any applicable public or private regulatory and listing authorities.

- Achieve responsible use of and control over all assets and resources entrusted to each Senior Financial Employee.

***Audit Committee Charter***

72.     The Charter of the Audit Committee of the Board of Directors of Volta, Inc. (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

73.     Per the Audit Committee Charter, the Audit Committee's purpose is to:

- Oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company;

- Assist the Board in oversight and monitoring of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulator requirements, (iii) the independent auditor's qualifications, independence and performance, and (iv) the Company's internal accounting and financial controls;

- Provide the Board with the results of its monitoring and recommendations derived therefrom; and

- Provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

74.     The Audit Committee Charter lists among the Audit Committee's responsibilities:

Review on a continuing basis the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and, if applicable, the attestations or reports by the independent auditors relating to such disclosure;

\*                  \*                  \*

Review and discuss with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

Direct the Company's independent auditors to review before filing with the SEC the Company's interim financial statements included in Quarterly Reports on Form 10Q, using professional standards and procedures for conducting such reviews;

Conduct a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors;

Review before release the unaudited quarterly or annual operating results (or financial outlook or guidance) to be stated in the Company's quarterly earnings release with particular attention to any use of "pro forma" or "adjusted" non-GAAP information;

\*                  \*                  \*

Review any reports by management or internal auditors, if any, regarding the effectiveness of, or any deficiencies in, the design or operation of internal controls and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls and review before release the disclosure regarding the Company's system of internal controls required under SEC rules to be contained in the Company's periodic filings and, if applicable, the attestations or reports by the independent auditors relating to such disclosure;

\*                  \*                  \*

Establish procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

Review and discuss with management, the independent auditor and the internal auditor, if any, the Company's major enterprise risk exposures and the steps management has taken to monitor and control such exposures, except as to those risks for which oversight has been assigned to other committees of the Board or retained by the Board;

75.     An additional "principal function[]" is to "oversee risk assessments and risk management pertaining to financial, accounting and tax matters of the Company."

76.     The Audit Committee Charter lists among the Audit Committee's responsibilities:

1. Review and discuss with management and the Independent Auditors the Company's quarterly results and the related earnings press release prior to distribution to the public.

2. Periodically discuss on a general basis with management the type of information to be disclosed and type of presentation to be made regarding released financial information.

\*               \*               \*

9. Discuss on a general basis the type of information to be disclosed and type of presentation to be made regarding financial information and earnings guidance to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentation to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

\*               \*               \*

11. Periodically discuss with the Company's principal accounting officer and principal in-house legal counsel the function of the Company's disclosure controls and procedures and any disclosure committee that may be established by the Company. Discuss with the Company's Chief Executive Officer and Chief Financial Officer their conclusions regarding the effectiveness of the Company's disclosure controls and procedures.

77.     The Individual Defendants violated Volta's Code of Conduct by engaging in or permitting the Company to issue materially false and misleading statements to the investing public, and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, supporting and profiting from unethical academic behavior, failing to avoid conflicts of interest, failing to respect the intellectual property rights of others, engaging in insider trading, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws,

rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law.

78. Moreover, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to issue materially false and misleading statements to the investing public, and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company' disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

79. Volta is a Delaware corporation based in California. The Company is an EV infrastructure company focused on building a network of EV charging stations. Volta currently maintains one of the most utilized EV charging networks in the United States. Volta's business model revolves around several pillars of revenue falling into the categories of behavior and commerce, network development, charging network operations, and network intelligence. Behavior and commerce generate revenue through advertisements displayed on charging stations. Network development generates revenue through installation services, operation and maintenance services, installed infrastructure for utility companies, and charging station products. Charging network operations generates revenue in regard to the usage of the charging stations, primarily, by selling regulatory credits or Low Carbon Fuel Standard credits to other regulated entities. Network intelligence generates revenue through the delivery of software as a service to customers, providing software updates for a subscription.

80.     Founded in 2010, Legacy Volta, then under the name Volta Industries, Inc. , was a private entity and only became public after a business combination with Tortoise Acquisition Corp. II ("Tortoise"), a publicly-traded special purpose acquisition company. On February 8, 2021, Tortoise filed a current report on Form 8-K with the SEC informing investors about the Business Combination. Attached to the Form 8-K was the Business Combination Agreement, which highlighted the terms and conditions of the Business Combination, including the Founder Incentive Adjustment Plan, a plan to provide RSU awards to Defendants Mercer and Wendel, covering up to 10,500,000 shares of Volta common stock. The Business Combination completed on August 26, 2021, the surviving entity was named Volta Inc.

**False and Misleading Statements**

***August 2, 2021 Form 424B3***

81.     On August 2, 2021, Tortoise filed a prospectus and proxy statement on Form 424B3 with the SEC (the "Prospectus Proxy Statement"), signed by Defendant Cubbage, soliciting approval from shareholders in regard to the Business Combination. The Proxy Statement stated, with regard to the risks of owning new Volta common stock after the Business Combination, that Defendants Mercer and Wendel will hold approximately 37.3% of the voting power of the Company due to them having held all outstanding Class B common shares, which provide ten votes per share as opposed to one vote per share afforded by Class A stock.

82.     The Proxy Statement also highlighted other risk factors, such as the risk associated with retaining key employees. The Prospectus Proxy Statement further explains that Legacy Volta, as a growing company in a competitive industry, relies heavily on key experienced employees to continue their growth and success. Failure to retain these key employees would not only hurt Legacy Volta's own prospects but may benefit competitors. Stated in relevant part:

> ***If Volta is unable to attract and retain key employees and hire qualified management, technical, engineering and sales personnel, its ability to compete and successfully grow its business would be harmed.***
>
> Volta's success depends on the continuing services of key employees, including members of its management team. The loss of any of these individuals could have a material adverse effect on Volta's business, financial condition and results of operations. Volta's success also depends, in part, on its continuing ability to identify, hire, attract, train and develop

and retain highly qualified personnel. The inability to do so effectively would adversely affect its business. Competition for employees can be intense, particularly in the San Francisco Bay Area where Volta is headquartered, ad the ability to attract, hire and retain them depends on Volta's ability to provide competitive compensation. In addition, Volta competes for qualified personnel with its other competitors in the EV charging industry, who may seek to hire Volta's employees from time to time due to their industry expertise. Volta may not be able to attract, assimilate, develop or retain qualified personnel in the future, and failure to do so could adversely affect its business, including its growth prospects and ability to expand into new markets and geographies.

83.     Another risk factor highlighted by the Prospectus Proxy Statement was Legacy Volta's material weakness in its internal control over financial reporting. The Prospectus Proxy Statement explained that, after the Business Combination, Legacy Volta will become a public company and will be subject to an increase in regulatory compliance and reporting requirements. If unable to meet these new standards, Volta could be subject to regulatory scrutiny, exposed to risk of regulatory action, and harm investors. Stated in relevant part:

In connection with the preparation and audit of Volta's consolidated financial statements for the years ended December 31, 2020 and 2019, material weaknesses were identified in its internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting *such that there is a reasonable possibility that a material misstatement of Volta's annual or interim financial statements will not be prevented or detected on a timely basis*. The following deficiencies in internal control over financial reporting were identified as material weaknesses:

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions and asset retirement obligations, commensurate with its accounting and reporting requirements.

- Volta did not maintain a sufficient complement of personnel to ensure appropriate segregation of duties to ensure that all journal entries and reconciliations were reviewed by an individual other than the preparer. Additionally, the Chief Financial Officer had inappropriate access rights in the general ledger system.

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately prevent, detect or correct material misstatements which resulted in a high volume of correcting journal entries recorded subsequent to year-end; and

- Volta did not design and maintain effective controls over certain information technology general controls for information systems that are relevant to the

1
2
3
4

preparation of its consolidated financial statements. Specifically, Volta did not design and maintain program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration.

(Emphasis added.)

5
6

84.     The Prospectus Proxy Statement also highlighted financial information for Legacy Volta,

7

stated, in relevant part:

8
9

Behavior and Commerce revenue increased by $2.4 million, or 212%, from March 31, 2020 to March 31, 2021, primarily due to large sales of media campaigns with several national brands in the three months ended March 31, 2021.

10
11
12
13

Network Development revenue decreased by $1.3 million, or 57%, from March 31, 2020 to March 31, 2021, primarily due to a decrease in installation service revenue of $0.7 million due to less construction activity occurring in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 and a decrease in infrastructure sales of $0.8 million due to no infrastructure sales occurring in the first quarter of 2021, offset by an increase in operations and maintenance revenue of $0.2 million due to an increase in the number of cumulative completed projects.

14
15
16

Charging Network Operations revenue decreased by $0.5 million, or 100%, from March 31, 2020 to March 31, 2021, due to no regulatory credit sales occurring in the three months ended March 31, 2021.

17
18

Volta has earned $0.2 million in Network Intelligence revenue since it began generating Network Intelligence revenue in November 2020.

19

*              *              *

20

*Selling, General and Administrative*

21
22
23
24
25
26
27

Selling, general and administrative expenses increased by $50.3 million, or 475%, for the three months ended March 31, 2021 as compared to the three months ended March 31, 2020. This was primarily driven by an increase in non-cash stock-based compensation of $45.3 million, driven primarily by the issuance of restricted stock awards to executive employees in the first quarter of 2021. This was also driven by an increase in legal, finance, tax and accounting services expense of $1.4 million, an increase in payroll costs for salaried employees of $1.7 million and an increase in research and development prototyping expense of $1.2 million related to charging technology improvement efforts. The payroll related cost increase was mainly driven by an increase in Volta's salaried employee headcount to 153 from 136 for the three months ended March 31, 2021 and 2020, respectively.

28

*              *              *

1
2

*Net Loss*

3
4

Net Loss increased by $52.1 million, or 397%, from March 31, 2020 to March 31, 2021, primarily due to an increase of $1.1 million in cost of revenues, an increase of $51.1 million in operating expenses and an increase in interest expense of $0.6 million, partially offset by a $0.8 million increase in revenue.

5
6
7
8
9
10
11

85.     On August 26, 2021, Volta announced the successful completion of the Business Combination. On August 30, 2021, in connection with the Business Combination, the Company filed statements of changes in beneficial ownership on Form 4 with the SEC, showing that the Company issued RSUs to Defendants Mercer and Wendel pursuant to the Founder Incentive Adjustment Plan found in the Business Combination Agreement. Specifically, Defendant Mercer received 5,250,000 shares of Class A common stock and Defendant Wendel received 5,250,000 shares of Class A common stock, both received on August 26, 2021.

12
13

**November 10, 2021 Earnings Call**

14
15
16

86.     On November 10, 2021, the Company held an earnings call to discuss with investors, Volta's results for 3Q 2021. While providing a run through of their financial results, Defendant Chadwick stated, in relevant part:

17

Third quarter revenues were $8.5 million, compared to $4.8 million in the prior year period, largely attributable to strong growth within behavior and commerce.

18
19
20
21

Behavior and commerce revenue grew to $7.4 million from 2.2 million in the prior year period, primarily due to increased sales of media campaigns, with several national brands. Cost of services was $5.4 million, compared to $4.6 million in the prior period, primarily due to increased station rent, driven by a larger aggregate number of active leases, additional advertising and media costs, and a rising network costs due to an increased charge for station data plans.

22
23
24

SG&A expenses were ***$29 million***, compared to $9 million in the prior year period. This was primarily due to planned growth initiatives that resulted in increased costs, including bonuses and commissions of $2.2 million, an additional insurance cost of $1.2 million, ***with one-time expenses related to non-cash stock-based compensation of $4.2 million*** and professional services primarily related to legal and finance fees of $3.2 million incurred related to the de-SPAC process.

25
26
27

***Net loss was $43.1 million***, compared to a loss of $14.5 million in the prior-year period and the EBITDA loss was 38.3 million, compared to a loss of $9.5 million in the prior year period.

28

In the quarter, Volta completed its business combination with Tortoise acquisition Corp II, resulting in proceeds of $350 million. The company had a cash and marketable securities

balance of $331 million as of September 30, 2021. Shares outstanding as of September 30, 2021, were 161.9 million.

(Emphasis added.)

### *November 12, 2021 Form 10-Q*

87.     Volta filed its quarterly report on Form 10-Q with the SEC on November 12, 2021, for 3Q 2021 (the "3Q21 10-Q"), signed by Defendants Mercer and Chadwick, confirming the previously released financial results. Specifically, under the heading "Results of Operations":

| *in thousands* | Three Months Ended September 30, | |
| --- | --- | --- |
| | **2021** | **2020** |
| **REVENUES** | | |
| Service revenue | $      8,058 $ | 4,043 |
| Product revenue | 372 | 752 |
| Other revenue | 60 | — |
| **Total revenues** | 8,490 | 4,795 |
| | | |
| **COSTS AND EXPENSES** | | |
| Costs of services (exclusive of depreciation and amortization shown below) | 5,347 | 4,554 |
| Costs of products (exclusive of depreciation and amortization shown below) | 528 | 669 |
| Selling, general and administrative | 28,963 | 8,954 |
| Depreciation and amortization | 3,116 | 2,257 |
| Other operating (income) expense | 203 | (13) |
| **Total costs and expenses** | 38,157 | 16,421 |
| **Loss from operations** | (29,667) | (11,626) |
| **OTHER EXPENSES** | | |
| Interest expense, net | 1,639 | 2,778 |
| Other expense, net | 188 | 97 |
| Change in fair value of warrant liability | 11,554 | (3) |
| **Total other expenses** | 13,381 | 2,872 |
| **LOSS BEFORE INCOME TAXES** | (43,048) | (14,498) |
| Income tax expense | — | 19 |
| **NET LOSS** | $     (43,048) $ | (14,517) |

88.     For compensation expense, the 3Q21 10-Q stated:

Compensation expense related to stock-based awards was recorded in selling, general and administrative in the condensed consolidated statements of operations and comprehensive loss for $4.6 million and $0.3 million for the three months ended September 30, 2021 and 2020, respectively, and $51.4 million and $0.8 million for the nine months ended September 30, 2021, and 2020 respectively.

89.     The 3Q21 10-Q also reiterated the material weakness with regard to internal control over financial reporting, stating, in relevant part:

As disclosed in our prospectus filed pursuant to Rule 424(b)(3) of the Securities Act on September 29, 2021, in connection with the preparation of Volta's condensed consolidated financial statements as of and for the years ended December 31, 2020 and 2019, certain

material weaknesses were identified in Volta's internal control over financial reporting. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of Volta's interim or annual condensed consolidated financial statements will not be prevented or detected on a timely basis. The material weaknesses were as follows:

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions and asset retirement obligations, commensurate with its accounting and reporting requirements.

- Volta did not maintain a sufficient complement of personnel to ensure appropriate segregation of duties to ensure that all journal entries and reconciliations were reviewed by an individual other than the preparer. Additionally, the Chief Financial Officer had inappropriate access rights in the general ledger system.

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately prevent, detect or correct material misstatements which resulted in a high volume of correcting journal entries recorded subsequent to year-end; and

- Volta did not design and maintain effective controls over certain information technology general controls for information systems that are relevant to the preparation of its condensed consolidated financial statements. Specifically, Volta did not design and maintain program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration.

90.   Under the title "Risk Factors," the 3Q21 10-Q reiterated the Prospectus Proxy Statement with regard to the risk of attracting and retaining key employees. Stated, in relevant part:

***If Volta is unable to attract and retain key employees and hire qualified management, technical, engineering and sales personnel, its ability to compete and successfully grow its business would be harmed.***

Volta's success depends on the continuing services of key employees, including members of its management team. The loss of any of these individuals could have a material adverse effect on Volta's business, financial condition and results of operations. Volta's success also depends, in part, on its continuing ability to identify, hire, attract, train and develop and retain highly qualified personnel. The inability to do so effectively would adversely affect its business. Competition for employees can be intense, particularly in the San Francisco Bay Area where Volta is headquartered, ad the ability to attract, hire and retain them depends on Volta's ability to provide competitive compensation. In addition, Volta competes for qualified personnel with its other competitors in the EV charging industry, who may seek to hire Volta's employees from time to time due to their industry expertise.

Volta may not be able to attract, assimilate, develop or retain qualified personnel in the future, and failure to do so could adversely affect its business, including its growth prospects and ability to expand into new markets and geographies.

***February 25, 2022 Form 8-K***

91.     On February 25, 2022, after the market had closed, Volta filed a current report on Form 8-K with the SEC, signed by Defendant Chadwick, stating that its Audit Committee of the Board ("Audit Committee") reached a determination that the financial information reported in the 3Q21 10-Q contained some inaccuracies. Specifically, the 8-K stated, in relevant part:

On February 24, 2022, the Audit Committee of the Board of Directors (the "Audit Committee") of Volta Inc. (the "Company" or "Volta") reached a determination that the Company's unaudited condensed consolidated financial statements and related disclosures included in its Quarterly Report on Form 10-Q for ***the three and nine months ended September 30, 2021 [] contained an understatement of stock-based compensation resulting in an understatement of the Company's net loss. The Company improperly assessed the accounting grant date of certain of the Company's restricted stock units ("RSUs") to be November 8, 2021, resulting in an understatement of stock-based compensation in the Relevant Periods.*** Upon further review, the Company determined the correct grant date under Audit Standard Codification 718 for these RSUs was August 26, 2021. The impact of correcting the accounting grant date is to shift the reporting periods in which stock-based compensation expense is recognized, and the Company expects that the preliminary, unaudited adjustments to stock-based compensation will increase net loss by approximately $26.7 million for the three and nine months ended September 30, 2021.

*                    *                    *

The Company, in consultation with the Audit Committee, has determined that (i) the unaudited condensed consolidated financial statements and similar communications by the Company relating to the Relevant Period should no longer be relied upon and (ii***) it is appropriate to correct the error resulting in the understatements for the Relevant Periods by restating such unaudited condensed consolidated financial statements because the understatements are material to the Company's previously issued unaudited condensed consolidated financial statements.*** The Company notes that:

- The adjustments do not impact revenue as presented on the consolidated statements of operations and comprehensive loss for the Relevant Period.
- The adjustments do not affect the total cash flows from operating, investing or financing activities as presented on the condensed consolidated statements of cash flows for the Relevant Period.
- While the understatements impact the timing of recognizing stock-based compensation expense, they do not impact the number of shares awarded, the timing of issuance of shares, or the aggregate amount of equity-based compensation expense to be recognized from the awards.

- The Company's management and the Audit Committee have determined the understatements were unintentional and were not the result of fraud or any other attempt to deceive.

*Preliminary Estimated Impact of Understatements*

The Company intends to restate its financial statements for the Relevant Periods, which will be addressed in an amendment to the Form 10-Q for the quarter ended September 30, 2021, to record the understatements. The estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital, ***resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $14.5 million and $69.7 million, respectively.***

(Emphasis added.)

92.     The statements identified in ¶¶ 81-84 and 86-91 were materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Volta failed to properly account for the grant date of RSUs issued in connection to the Business Combination; (2) due to the foregoing, Volta understated its net loss for 3Q 2021; (3) there were material weaknesses in Volta's internal control over financial reporting that caused material error; (4) due to the foregoing, Volta would restate its financial statements; (5) Legacy Volta's founders would immediately resign following the material inaccuracies reported in the Company's financial statements; (6) as a result of the foregoing, the Company would experience adverse impact to its financial results; and (7) the Company failed to maintain internal controls.   As a result of the foregoing, Volta's public statements were materially false and misleading at all relevant times.

## **The Truth Begins to Emerge**

### *March 2, 2022 Form 8-K*

93.     On March 2, 2020, after market close, Volta filed an amended Form 8-K with the SEC, signed by Defendant Chadwick, stating that Company had improperly assessed the grant date of specific RSUs and that as a result stock-based compensation and net loss were greater than previously stated. Specifically, the 8-K stated, in relevant part:

The Company improperly assessed the accounting grant date of certain of the Company's restricted stock units ("RSUs") to be November 8, 2021, resulting in an understatement of

stock-based compensation in the [three- and nine-months periods ending September 30, 2021]. Upon further review, the Company determined the correct grant date under Accounting Standards Codification ("ASC") 718 for these RSUs was August 26, 2021. The impact of correcting the accounting grant date is to shift the reporting periods in which stock-based compensation expense is recognized, and the Company expects that the preliminary, unaudited adjustments to stock-based compensation will increase net loss by approximately $26.7 million for the three and nine months ended September 30, 2021.

The understatements during the Relevant Periods relate to stock-based compensation expense for certain of the Company's RSUs granted pursuant to the Company's Founder Incentive Plan, which approved in connection with the Company's business combination[.]

\*           \*           \*

The estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase in paid-in capital, resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $69.7 million and $155.5 million, respectively.

94.     On this news, the Company's stock price fell $0.11 per share, or 2.6%, from $4.12 per share at close on March 2, 2022 to $4.01 per share at close on March 3, 2022. The stock price fell another $0.23 per share, or 5.7%, the following day, from $4.01 per share at close on March 3, 2022 to $3.78 per share at close on March 4, 2022.

### March 21, 2022 Announcement

95.     On March 21, 2022 Volta was expected to release their fourth quarter and year-end financial results for the fiscal year of 2021. Instead, Volta announced that it would reschedule its year end conference call "once it completes the necessary review of its financial results." In the same press release, it also announced that it will file an amendment to its 3Q21 10-Q.

96.     On this news, the Company's stock price fell $0.38 per share, or 8.4%, from $4.50 per share at close on March 18, 2022 to $4.12 per share at close on March 21, 2022, while experiencing rather high trading volume.

### March 22, 2022 Amended Form 10-Q

97.     On March 22, 2022, Volta filed an amended 10-Q with the SEC for the 3Q21 10-Q ("Amended 10-Q"), signed by Defendants Mercer and Chadwick. The Amended 10-Q explained that it had:

[I]mproperly assessed the accounting grant date of certain of the Company's restricted stock units ("RSUs"), resulting in an understatement of the stock-based compensation for the three and nine months ended September 30, 2021. […] The Company's management and the Audit Committee of the Company's Board of Directors determined that material weaknesses existed in the Company's internal control over financing reporting due to the lack of formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions, commensurate with its accounting and reporting requirements, and due to the lack of effective controls over certain information technology general controls for the information systems that are relevant to the preparation of its condensed consolidated financial statements, specifically program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration. These material weaknesses in the Company's internal control over financial reporting that resulted in the understatement of stock-based compensation.

98.     The Amended 10-Q reinstated financial information, stated, in relevant part:

| | Three Months Ended September 30, | |
| | 2021 | 2020 |
| | (Restated) | |
| | | (in thousands except s...) |
| REVENUES | | |
| Service revenue | $    8,058 | $    4,043 |
| Product revenue | 372 | 752 |
| Other revenue | 60 | — |
| **Total revenues** | 8,490 | 4,795 |
| COSTS AND EXPENSES | | |
| Costs of services (exclusive of depreciation and amortization shown below) | 5,347 | 4,554 |
| Costs of products (exclusive of depreciation and amortization shown below) | 528 | 669 |
| Selling, general and administrative | 55,664 | 8,954 |
| Depreciation and amortization | 3,116 | 2,257 |
| Other operating (income) expense | 203 | (13) |
| **Total costs and expenses** | 64,858 | 16,421 |
| **Loss from operations** | (56,368) | (11,626) |
| OTHER EXPENSES | | |
| Interest expense, net | 1,639 | 2,778 |
| Other expense, net | 188 | 97 |
| Change in fair value of warrant liability | 11,554 | (3) |
| **Total other expenses** | 13,381 | 2,872 |
| **LOSS BEFORE INCOME TAXES** | (69,749) | (14,498) |
| Income tax expense | — | 19 |
| **NET LOSS** | $    (69,749) | $    (14,517) |

99.     The Amended 10-Q admitted weaknesses in its internal controls over financial reporting:

As discussed in the Explanatory Note to this Amendment No. 1 and in connection with the Restatement and of our unaudited condensed financial statements as of, and for the three and nine months ended, September 30, 2021, we determined that our previously reported weaknesses, namely that our review control over the completeness and accuracy of our stock-based compensation reporting and program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration did not operate effectively, resulting in a material error in the financial statements.

100.     Although the Company eventually disclosed information regarding their improperly accounted-for RSUs, caused by the material weaknesses within its internal controls over financial

reporting, it failed to disclose that Legacy Volta founders, Defendants Mercer and Wendel, would resign from the Company as a result of the damage caused by the Company restating its 3Q21 financial statement.

## The Truth Emerges

101.    On March 28, 2022, Volta filed a current report on Form 8-K with the SEC. Volta announced a leadership transition, where co-founder Defendant Wendel, effective immediately, resigned from his position as President and from the Board. Fellow co-founder Defendant Mercer also resigned from his position as CEO and from the Board but will continue is role as CEO for a transition period while assisting the Board in searching for a new CEO. Defendant Mercer will also serve as an independent advisor to the Board through March 31, 2023.

102.    The March 28, 2022 Form 8-K also discussed the settlement and release agreements ("Separation Agreements") made in connection with Defendants Mercer and Wendel's resignations. Under the Separation Agreement, Defendants Mercer and Wendel will continue to receive payment of their respective base salaries for a period of six months as well as continued healthcare coverage for a period of up to twelve months. Defendant Mercer also agreed to serve as an independent advisor to the Board through March 31, 2023 for a consulting fee of $375,000 for the totality of his services.

103.    On this news, the Company's share price fell $0.76 per share, or 18%, from $4.13 per share at close on March 25, 2022 to $3.37 per share at close on March 28, 2022.

## DAMAGES TO VOLTA

104.    As a direct and proximate result of the Individual Defendants' misconduct, Volta has lost and expended, and will lose and expend, many millions of dollars.

105.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company and two of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

106.    Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

107.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to

the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

108.    As a direct and proximate result of the Individual Defendants' conduct, Volta has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

109.    Plaintiff brings this action derivatively and for the benefit of Volta to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Volta, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

110.    Volta is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

111.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Volta. Plaintiff will adequately and fairly represent the interests of Volta in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

112.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

113.    A pre-suit demand on the Board of Volta is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Aheto, Cubbage, Lauber, Savitt, Stewart, and Tough (collectively, the "Director-Defendants"). Plaintiff needs only to allege demand futility as to three of six Director-Defendants that were on the Board at the time this action was commenced.

114.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in

knowingly or recklessly to cause or permit the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

115.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated is causing or permitted the Company to engage in materially misrepresenting financial information and making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

116.   Additional reasons that demand on Defendant Aheto is futile follow. Defendant Aheto has served as a Company director since August 2021 and served as a director at Legacy Volta since October 2016. He also serves as Chair of the Audit Committee. Defendant Aheto has received and continues to receive significant compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Aheto breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

117.   Additional reasons that demand on Defendant Cubbage is futile follow. Defendant Cubbage has served as a Company director since August 2021. He also serves as Chair of the Nominating and Corporate Governance Committee as well as being a member of the Audit Committee. Defendant Cubbage has received and continues to receive significant compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Cubbage breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118.    Additional reasons that demand on Defendant Lauber is futile follow. Defendant Lauber has served as a Company director since August 2021 and served as a Legacy Volta director since June 2020. He is a member of both the Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Lauber has received and continues to receive significant compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Lauber breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119.    Additional reasons that demand on Defendant Savitt is futile follow. Defendant Savitt has served as Chairperson of the Board since June 12, 2022, a Company director since August 2021, and served as a Legacy Volta director since December 2018. She is a member of both the Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Savitt has received and continues to receive significant compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the schemes to make false and misleading statements; consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Savitt breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

120.    Additional reasons that demand on Defendant Stewart is futile follow. Defendant Stewart has served as a Company director since August 2021 and served as a Legacy Volta director since March 2021. She is a member of both the Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Stewart has received and continues to receive significant compensation for her role as a director. As a trusted Company director, she conducted little, if any,

oversight of the Company's engagement in the schemes to make false and misleading statements; consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Stewart breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

121.    Additional reasons that demand on Defendant Tough is futile follow. Defendant Tough has served as a Company director since August 2021 and served as a Legacy Volta director since May 2019. He also serves as Chair of the Compensation Committee as well as being a member of the Audit Committee. Defendant Tough has received and continues to receive significant compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Tough breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

122.    Defendants Aheto (as Chair), Cubbage, and Tough (collectively, the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. The Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition the Audit Committee Defendants violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the

Company' disclosure controls and procedures. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

123.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, supporting and profiting from unethical behavior, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

124.    Volta has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the directors have not filed any lawsuits against the Director-Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Volta any part of the damages Volta suffered and will continue to suffer thereby. Thus, any demand upon the directors would be futile.

125.    The acts complained of herein constitute violations of fiduciary duties owed by Volta's officers and directors, and these acts are incapable of ratification.

126.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Volta. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Volta, there would be no directors' and officers' insurance protection. Accordingly, the

Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

127.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants, and if not all at least a majority of the Directors, face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

128.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Volta to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

129.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

130.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

131.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Volta's business and affairs.

132.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

133.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless

breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Volta.

134.    In breach of their fiduciary duties owed to Volta, the Individual Defendants willfully or recklessly made and/or caused or permitted the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia,* that : (1) Volta failed to properly account for the grant date of RSUs issued in connection to the Business Combination; (2) due to the foregoing, Volta understated its net loss for 3Q 2021; (3) there were material weaknesses in Volta's internal control over financial reporting resulting in material error within their financial statements; (4) due to the foregoing, Volta would restate its financial statements; (5) Legacy Volta's founders would resign following the material inaccuracies reported in the Company's financial statements; (6) as a result of the foregoing, the Company would experience adverse impact to its financial results; and (7) the Company failed to maintain internal controls. As a result of the foregoing, Volta's public statements were materially false and misleading at all relevant times.

135.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

136.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

137.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

138.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

139.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

140.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Volta has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

141.    Plaintiff on behalf of Volta has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

142.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

143.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Volta.

144.    The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Volta that was tied to the performance or artificially inflated

valuation of Volta, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

145.    Plaintiff, as a shareholder and representative of Volta, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation— obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

146.    Plaintiff on behalf of Volta has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Abuse of Control

147.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

148.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Volta, for which they are legally responsible.

149.    As a direct and proximate result of the Individual Defendants' abuse of control, Volta has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

150.    Plaintiff on behalf of Volta has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

151.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

152.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Volta in a manner consistent with the operations of a publicly-held corporation.

153.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Volta has sustained and will continue to sustain significant damages.

154.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

155.   Plaintiff on behalf of Volta has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

156.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Actions), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

158.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

159.   Plaintiff on behalf of Volta has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants Mercer and Chadwick for Contribution Under Sections 10(b) and 21D of the Exchange Act

160.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

161.   Volta, along with Defendants Mercer and Chadwick, are named as defendants in the Securities Class Actions, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Mercer's and Chadwick's willful and/or reckless violations of their obligations as officers and/or director of Volta.

162.   Defendants Mercer and Chadwick, because of their positions of control and authority as officers and/or director of Volta, were able to and did, directly and/or indirectly, exercise control over the

business and corporate affairs of Volta, including the wrongful acts complained of herein and in the Securities Class Actions.

163.     Accordingly, Defendants Mercer and Chadwick are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

164.     As such, Volta is entitled to receive all appropriate contribution or indemnification from Defendants Mercer and Chadwick.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Volta, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Volta;

(c)     Determining and awarding to Volta the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Volta and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Volta and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  a provision to permit the shareholders of Volta to nominate at least three  candidates for election to the Board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Volta restitution from the Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: July 9, 2022                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**
*/s/ Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Hugues Gervat am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2022.

7/8/2022

DocuSigned by:

**Hugues Gervat**

2F6AF3BA1A3040E...

Hugues Gervat